IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION


SAMANTHA JOHNSON,              )
                              )
     Plaintiff,               )
                              )
     v.                       )   CIVIL ACTION NO.
                              )     3:04cv63-T
AUBURN UNIVERSITY, etc.,      )       (WO)
                              )
     Defendant.               )


OPINION

Plaintiff Samantha Johnson, an American of African descent, brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e-17, against defendant Auburn University.  She claims that Auburn failed to reclassify her position to a higher pay grade because of her race; she further claims that Auburn failed to reclassify her to a higher pay grade in retaliation for previous allegations of racial discrimination.

Jurisdiction over Johnson's claims is proper under 42 U.S.C.A. § 2000e-5(f)(3).

This case is currently before the court on Auburn's motion for summary judgment. The motion will be granted.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under

Rule 56). The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings. Fed. R. Civ. P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).


## II. BACKGROUND

The following facts are construed in Johnson's favor as the non-moving party: Johnson began working at Auburn in 1979 as a Staff Clerk in the Financial Aid Office. In 1987, she was promoted to Administrative

Clerk, and, in 1990, her position was reclassified to Supervisor Records Student Financial Aid.

In 1997, the Financial Aid Office established a career-ladder system, and Johnson's position changed to Student Affairs Specialist, Financial Aid-Records, a grade-eight position. In July 2002, her position was reclassified to Administrative Support Associate II, also a grade-eight position. In May 2003, Johnson's job was eliminated due to technological improvements; she was transferred to the Admissions and Records Office and, in this position, received the same salary and benefits. Johnson was consistently among the highest paid grade-eight employees in the Financial Aid Office, and received a greater than average merit increase in 2002.[1]

---

1. Defendant's evidentiary submission on defendant's motion for summary judgment (Doc. No. 18), Ex. 1, Declaration of Lynne Hammond ("Hammond declaration"), ¶¶ 3-4, 20.

4

### A. Johnson's Requests for Reclassification or Promotion

Beginning in 1986, Johnson made numerous requests for reclassification and promotion. In response to such a request in 1987, she was promoted;[2] in response to a request for reclassification in the early 1990s, Auburn conducted a job analysis, which revealed that Johnson's position was properly classified; and, in response to a letter by Johnson in 1997 complaining that positions held by white employees were being upgraded while her position and the position of other minority employees were not, Auburn conducted a job review and informed Johnson that her job was properly classified and no data supported the contention there was inequity in minority advancement opportunities.

In 1998, Johnson was offered additional duties that might have justified a higher classification. Johnson declined the offer, stating that she did not find the

_____

2. Id., ¶¶ 5-6.

10 % raise adequate to compensate her for the additional duties.[3]

In October 1999, Auburn conducted another job analysis of Johnson's position in response to a request from her supervisor. Johnson and her supervisor were advised that her position was properly classified, and she was encouraged to work with the Human Resources Department to pursue positions in other departments that had higher grade classifications. Instead, in late 1999, Johnson presented her concerns about the classification of her job and possible racial bias to the Provost and the President of Auburn. Both advised her that her job was properly classified, that her salary was above the midpoint for similar positions, and that she should work with Human Resources to identify advancement opportunities for which she was qualified.[4]

---

3. <u>Id</u>., Exs. 5-6, 8.

4. <u>Id</u>., Exs. 9-15.

In the fall of 2000, Johnson met with the affirmative action/equal employment opportunity (EEO) officer for Auburn to express concerns that Auburn's decision not to promote or reclassify her was influenced by her race.[5]  In 2001, Johnson requested that her position be reclassified, and, in response, Auburn again conducted an audit of her position, which indicated that her position was properly classified as a grade eight position.[6]

In 2002, Auburn conducted a job study of all clerical and administrative positions in the Office of Student Affairs to ensure that all positions were properly graded.  The 2002 study focused solely on the duties and responsibilities of the position rather than the employee's characteristics.  It was conducted in

---

5. Plaintiff's evidentiary submission on defendant's motion for summary judgment (Doc. No. 26), Affidavit of Samantha Johnson ("Johnson affidavit"), ¶ 10 & Ex. 8.

6. Defendant's evidentiary submission on defendant's motion for summary judgment (Doc. No. 18), Ex. 2, Declaration of Chuck Gerards ("Gerards declaration"), ¶ 9.

accordance with the <u>Uniform Guidelines on Employee Selection</u> published by the Equal Employment Opportunity Commission (EEOC). The study included 50 positions, of which 17 were held by black employees and 33 by white employees. As a result of the study, eight black employees (approximately 47 %) received an increase in grade, six black employees (approximately 35 %), including Johnson, had no change, and three (approximately 18 %) were decreased. Thirteen white employees (approximately 30 %) received an increase in grade, 17 (approximately 52 %) had no change, and three (approximately 18 %) were decreased.[7]

The protocol for the 2002 study required that the results be independently reviewed and verified. In some instances, the analyst entered the scores on the incorrect line, and the scores were manually adjusted during the review process. In other cases, arithmetic errors in calculating the total score were corrected.

---

7. <u>Id.</u>, ¶¶ 2, 4, 6, 11.

Johnson's score was adjusted in the verification process.[8]

The 2002 study protocol also required that the employees fill out a four-page questionnaire describing their duties and the skill-set necessary for their job. Johnson had previously completed a ten-page questionnaire during the audit of her position conducted in 2001. In response to the 2002 study, she elected to submit the ten-page questionnaire, supplemented by the first page of the four-page questionnaire.[9]

On July 9, 2002, Johnson was advised that, based on the 2002 study, her position was properly classified as grade eight.[10]  The next day Johnson sent an email to

_____

8. Id., ¶ 10. Auburn maintains that Johnson's score was adjusted because several of her scores had been entered on the wrong line, and that her score actually increased during the verification process. Id. Johnson maintains that her score was lowered during the verification process. Plaintiff's brief in opposition to defendant's motion for summary judgment (Doc. No. 25), p. 22 n.58.

9. Gerards declaration, ¶ 9.

10. Id., ¶ 15 & Ex. 13.

her supervisor reminding him that she had supervisory
experience and noting that white employees had been
upgraded while she had not.[11]

On July 15, 2002, Johnson filed a complaint with
the EEOC claiming discrimination and retaliation.[12]   In
August 2002, Johnson wrote two letters to an EEOC
employee, a "Mrs. Hallaway,"[13] complaining that white
employees were being upgraded while she was not.[14]   In
August 2003, the EEOC issued a determination in
Johnson's favor.[15]

---

11. Id., ¶ 17.

12. Id., ¶ 18.

13. Although the record is not entirely clear who
Mrs. Hallaway is, she appears to be an EEOC employee in
the Birmingham office.  See Johnson affidavit, Ex. 9.

14. Johnson affidavit, ¶¶ 11 & 19; Stipulation (Doc.
No. 36), dated October 6, 2005.

15. Plaintiff's evidentiary submission on defendant's
motion summary judgment (Doc. No. 26), Ex. 5, EEOC
Determination letter.

## B. Johnson's Duties

The parties dispute the scope of Johnson's duties. Auburn characterizes Johnson's duties as primarily clerical, including data entry, creating paper files for students, ensuring that financial aid files contained all pertinent information, ordering supplies for the office, and maintaining the files securely.[16] Johnson contends she had non-clerical responsibilities, exercised substantial discretion, and supervised others.

The March 2002 job review completed by Johnson's supervisor indicates that she "serve[d] a lead role to

_____

16. Gerards declaration, ¶ 18. Auburn relies on Pennington v. Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001), and Standard v. A.B.E.L. Services Inc., 161 F.3d 1318, 1332-33 (11th Cir. 1998), to support its contention that Johnson's characterization of her duties is irrelevant on summary judgment. This argument is misplaced: both Pennington and Standard involved a plaintiff's unsubstantiated personal opinion that the defendant's proffered legitimate, non-discriminatory reason was pretext. The dispute here involves a matter critical to the prima-facie case: the scope of Johnson's duties. Her testimony about the duties she performed is clearly relevant in determining whether her job is sufficiently similar to another employee's for that employee to serve as a valid comparator.

train and to assign and check the work of others."[17]
The job description of Student Affairs Specialist,
Financial Aid-Records, dated March 7, 2002, reflects
that the job "requires the frequent interpretation of
written policies, procedures, and guidelines for
moderately complex situations [and] requires knowledge
of procedures in a technical field requiring a
combination of training and experience."   It also
indicates that Johnson "supervise[d] student workers
and coordinate[d] their work schedule and timesheets."
The job description also states that "the person in
this position impacts the perception that an individual
would have of the department, enrollment management
services, and the student affairs division."[18]
Johnson's affidavit indicates that she spent two to
three hours a day on phone duty answering questions

---

17. Johnson affidavit, Ex. 10.

18. Plaintiff's evidentiary submission on defendant's
motion summary judgment (Doc. No. 26), Ex. 12, Job
Description of Student Affairs Specialist, Financial Aid-
Records.

about financial aid posed by students and parents.[19]
Finally, the ten-page questionnaire Johnson completed
corroborates that she supervised the records office,
advised other personnel on records information, and
supervised student workers.[20]

Thus, the evidence viewed in the light most
favorable to Johnson reveals that, in addition to the
clerical duties described by Auburn, she also performed
the following duties:

- Supervise records office, serving a lead role to train and to assign and check the work of others.
- Interpret written policies, procedures, and guidelines for moderately complex situations.
- Perform three hours of phone duty to advise parents and students on financial aid rules and regulations.
- Advise other personnel on records information.
- Supervise student workers.

---

19. Johnson affidavit, ¶ 29.

20. Plaintiff's evidentiary submission on defendant's motion summary judgment (Doc. No. 26), Ex. 8, Self-assessment of Samantha Johnson.

13

The record does not support Johnson's contention that she supervised other full-time employees at the time of the 2002 study.[21]


### C. Duties of Alleged Comparators

The name, title, and duties of four other employees in the Financial Aid office whom Johnson has identified as alleged comparators are summarized below.[22]  Gayle Segrest, Student Affairs Specialist-Athletics, performed the following duties:

- Maintain squad lists for student athletes.
- Determine if athletes are eligible for aid/scholarships based on National Collegiate Athletic Association (NCAA) and Southeastern Athletic Conference (SEC) regulations.
- Ensure that sport teams do not exceed amount of aid allowed under NCAA and SEC regulations.
- Serve as liaison between student athletes and donors to ensure eligibility based on NCAA and SEC regulations.

---

21. Although Johnson may have supervised a full-time employee in the past, see Johnson affidavit, Ex. 15, no evidence suggests that she supervised full-time employees at the time of the 2002 study.

22. The summary of these duties is taken from Gerards declaration, ¶ 18.

14

- Ensure student athletes maintain minimum GPA and credit hours to receive scholarships/financial aid.

Tammy Funderburk, Student Affairs Specialist-Direct

Lending, had the following duties:

- Perform the same duties as Segrest.
- Assist with loading and verification of tax documents.
- Monitor transfer lists for students.
- Process corrections.

Debbie Allen, Student Affairs Specialist-Data Support,

performed these duties:

- Interpret scholarship agreements.
- Select recipients based on criteria.
- Maintain databases for scholarships.
- Prepare award letters and letters to donors.
- Verify student eligibility for scholarships.
- Create and print reports.
- Verify account balances.

And Stan Fuller, Student Affairs Specialist-Financial

Aid, had the following responsibilities:

- Review verification forms required by the Department of Education and FAFSA applications for accuracy.
- Determine when changes are necessary based on verification documents.
- Contact parents and students to address discrepancies.

- **Advise students on Department of Education rules that regulate how much aid students can receive.**
- **Determine how financial aid monies can be spent.**
- **Make budgetary projections for Financial Aid Division.**
- **Ensure students are enrolled in enough credit hours to receive financial aid.**

Johnson has also identified Mary Turner as an alleged comparator.  Turner was reclassified to grade ten in 1990, was not subject to the 2002 study, and worked in a different division under a different supervisor.[23]


## III. DISCUSSION

Under Title VII, it is illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...."  42 U.S.C.A. § 2000e-2(a)(1).

---

23. Hammond declaration, ¶ 20.

Both parties acknowledge that, because Johnson relies on circumstantial evidence, this case is governed by the familiar burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas approach, an employee has the initial burden of establishing a prima-facie case of unlawful employment discrimination by a preponderance of the evidence. Id. at 802; Young v. General Food Corp., 840 F.2d 825, 828 (11th Cir. 1988). If the employee establishes a prima-facie case, the burden then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for its employment action. Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000). The employer has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. See, e.g., Texas Dep't of Cmty Affairs v. Burdine, 450 U.S. 247, 253-55, 258 (1981); McDonnell Douglas, 411 U.S. at 802.

17

Once the employer satisfies this burden of production, "the presumption of discrimination is eliminated and 'the [employee] has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" Chapman, 229 F.3d at 1024 (citations omitted). The employee may meet this burden by persuading the court that a discriminatory reason more than likely motivated the employer or by demonstrating that the proffered reason for the employment decision is not worthy of belief. Burdine, 450 U.S. at 256; see also Young, 840 F.2d at 828.

### A. Failure-to-Reclassify Claim

#### 1. Prima-Facie Case

In order to prove a prima-facie case for failure to reclassify, the employee may prove that: (1) positions

held by comparable white employees were reclassified and upgraded; or (2) the difference in the grades was the result of racial considerations.  <u>Moore v. Devine</u>, 767 F.2d 1541, 1546 (11th Cir. 1985).  "The plaintiff and the employee she identifies as a comparator must be similarly situated in all relevant respects.  The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer."  <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1091 (11th Cir. 2004).

Johnson identifies five individuals who were white and were reclassified to a higher grade as a result of the 2002 job audit: Gayle Segrest, Tammy Funderburk, Debbie Allen, Stan Fuller, and Mary Turner.  Turner is not a valid comparator because she was not subject to the 2002 study, she worked in a different division, and a supervisor, different from Johnson's, made employment decisions for her.  <u>See</u> <u>Silvera v. Orange County Sch. Board</u>, 244 F.3d 1253, 1261 (11th Cir. 2001) ("[D]ifferences in treatment by different supervisors

or decision makers can seldom be the basis for a viable claim of discrimination."). Because Johnson and the four remaining alleged comparators all performed clerical duties and reviewed documents for accuracy, the following comparison focuses on the non-clerical duties performed by each.

Funderburk interpreted SEC and NCAA regulations to ensure that Auburn did not violate those rules in awarding scholarships to its student athletes. This required her to analyze the regulatory framework governing athletic scholarships, discern the principles at work, and then apply them to university-wide data. Funderburk also regularly interacted with donors to ensure that they did not undermine student-athletes' eligibility. In contrast, during her three-hour phone duty, Johnson merely referenced already-completed analyses of financial aid regulations to answer questions posed to her by parents and students. Moreover, Johnson's counseling sessions impacted only the image of the Financial Aid Office held by the

individuals she counseled.   If Funderburk made a mistake, Auburn could suffer sanctions for violating SEC or NCAA rules, which would be public and potentially have a broad impact on Auburn's image. Because the scope and consequences of their duties differed, Johnson and Funderburk are not similarly situated, and Funderburk is not a valid comparator.

Segrest performed the same duties as Funderburk, les certain clerical duties.   Thus, she also was not similarly situated to Johnson and is not a valid comparator.

Allen selected scholarship recipients based on scholarship criteria, which requires considerable independent judgment and discretion.   Johnson acknowledges that she did not have the authority in her position to award financial aid to students.[24]   Thus, these positions are not nearly identical, and Allen is not a valid comparator.

---

24. Plaintiff's evidentiary submission on defendant's motion summary judgment (Doc. No. 26), Ex. 5, Johnson's self-evaluation, P0088.

Fuller was responsible for making budgetary projections for the Financial Aid Division based on changes in workforce or supplies. In contrast, Johnson ordered supplies for her office after checking to see if funds were available. Because Fuller's job required substantially greater expertise and judgment than Johnson's, he was not similarly situated to Johnson and is not a valid comparator.

The court's conclusion that Johnson has not identified valid comparators is corroborated by Johnson's own admission at the time of the 2002 study that the duties of Funderburk, Segrest, Allen, and Fuller differed substantially from hers. In an August 22, 2002, letter to Hallaway, Johnson stated, "I reiterate, I was not given any of the duties that [the alleged comparators] were given that warranted them the upgrade...."[25]

---

25. Johnson affidavit, Ex. 17.

Johnson also fails as to the alternative method of establishing a prima-facie case: that any difference in treatment was because of her race.[26]  Even if these four employees were valid comparators, no evidence in the record suggests that their reclassification to a higher grade, as a result of the 2002 study, was due to race. In fact, the evidence proves the exact opposite, because the 2002 study was more favorable to blacks than to whites.  Nearly 50 % of black employees were upgraded, while approximately 37 % of white employees were upgraded, and the same percentage of blacks and whites were downgraded as a result of the 2002 study. Contrary to Johnson's assertion, the 2002 study was not discriminatory simply because she was not among the many black employees upgraded.

---

26. Although it remains unclear why these employees, who are white, received more substantive duties than Johnson, Johnson advances no evidence that demonstrates such assignments were made because of race.   Also, Johnson's refusal in 1998 to accept additional duties that might have warranted an upgrade under the 2002 study, <u>see</u> Hammond declaration, Ex. 8, undermine any inference that Johnson was discriminated against in the assignment of duties.

## 2. Pretext

Even assuming that Johnson could state a prima-facie case, she would still have to show that Auburn's proffered legitimate, non-discriminatory reason for not reclassifying her is pretextual.  Auburn contends that it did not reclassify Johnson to a higher pay grade because her position did not merit a higher grade within the parameters of the 2002 job study.  Auburn claims that race did not factor into the 2002 study because it complied with the Uniform Guidelines published by the EEOC and was based solely on job duties, not incumbent characteristics.  Also, the study was overall more favorable to blacks than whites.  Johnson offers several theories why Auburn's proffered non-discriminatory reason is pretextual.

First, Johnson argues that the 2002 study was racially discriminatory because she submitted a ten-page questionnaire, while everyone else filled out a four-page survey.  However, it was Johnson who elected to submit the ten-page questionnaire instead of the

24

four-page questionnaire.  Every other aspect of the
process in the 2002 study was the same for Johnson as
ti was for every other employee.  Therefore, any
difference in procedure was of her own choosing and
cannot support an inference of pretext.  Moreover, no
reasonable fact-finder could conclude that Johnson's
race was the reason she filled out the ten-page
questionnaire, given that not only whites but all other
black employees subject to the 2002 study filled out
the four-page questionnaire.

    Second, Johnson complains that she received a lower
score for "public image" than did her alleged
comparators.  The 2002 study protocol required
supervisors to assign a score for public image to each
position.  Public image was defined as the effect the
person might have on Auburn's public image if she
excels, or fails, at her job.[27]  Johnson suggests that,
because she was popular on campus and had good customer

_____

    27. Gerards declaration, Ex. 2, Study protocol,
0326.

relations, her low public-image score can be explained by only her race. Funderburk, Segrest, and Allen all interfaced with donors, and all four alleged comparators were responsible for ensuring that Auburn was in compliance with regulations imposed by outside entities. The court will not second-guess Auburn's determination that Johnson, whose duties affected only the attitudes of individual people toward the Financial Aid Department, was less important to Auburn's public image than employees whose actions affected the attitudes of donors and might cause Auburn to violate regulations. See Alexander v. Fulton County, Ga., 207 F.3d 1303, 1341 (11th Cir. 2000).

Moreover, the relevant inquiry is how the employer values the employee, not the employee's subjective view of her value. Standard v. A.B.E.L. Services Inc., 161 F.3d 1318, 1332-33 (11th Cir. 1998) ("The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the [adverse action], but whether the employer really was motivated

by those reasons."). Johnson has presented no evidence to prove that Auburn disregarded the 2002 study protocol in assigning her public-image score.

Third, Johnson notes that her supervisor recommended her for an upgrade in 1999 and that she held a higher grade than all her comparators did in the late 1990s. According to Johnson, this suggests that, in 1999, Auburn valued her more highly than it did her comparators. Although she does not complete the argument, presumably she means to suggest that the increased value placed on the comparators in 2003 was because of their race. This is not a reasonable inference because Johnson's job was eliminated a year after the 2002 study when technological changes made it obsolete, while the jobs of her alleged comparators were not eliminated. Johnson's mere speculation and conclusory allegations unsupported by any evidence are not sufficient to support an inference of pretext, especially when Auburn has presented substantial evidence that the 2002 study was not influenced by

27

race.    See  Coutu  v.  Martin  County  Bd.  of  County
Comm'rs, 47 F.3d 1068, 1073-74 (11 Cir. 1995).  Also,
those employees were white in 1999, just as they were
in 2002.  Johnson's argument would require a fact-
finder to believe that Auburn only began valuing white
employees over black employees after 1999.  Such an
inference would be unreasonable based on the evidence
advanced by Johnson.

Next, Johnson argues in her brief that Auburn's
stated reason for not reclassifying her is pretextual
because the reasons given to her in 2002 differ from
those offered by Auburn on summary judgment.  Simply
put, the record does not support Johnson's contention
that Auburn told her that the only reason she was not
reclassified was her lack of supervision of full-time
employees.  Her affidavit, which is the only testimony
from her submitted to the court, makes no mention of
such a conversation.  The only reference to supervision
in the record comes in an email exchange between
Johnson and Mike Reynolds, her supervisor, on July 10,

2002.[28]   In that email, Johnson indicates that she contacted the Vice President of Human Resources, who told her that Mary Turner, an employee in Human Resources, supervised one full-time employee.  Johnson then tells Reynolds that she would be willing to supervise a full-time employee.   If this exchange proves anything, it is that Johnson raised the supervision issue, not Auburn.   Johnson bears the burden of coming forward with evidence of pretext, Burdine, 450 U.S. at 256, and she has not met that burden.

Finally, Johnson contends that the fact that her score on the 2002 study was lowered suggests she was targeted.  The study protocol required Human Resources to verify independently the scores for accuracy and make necessary changes.  The scores of employees other than Johnson were changed, and these changes equally affected both white and black employees.   Because

---

28. Johnson affidavit, Ex. 15.

employees of both races had their scores changed, an inference that the verification process of the 2002 study was racially biased would be unreasonable. Moreover, Classification and Compensation Director Chuck Gerards indicated that Johnson's score actually increased during the review process.   Johnson offers nothing more than mere assertion in her brief to rebut Gerards's testimony.[29]   Because Johnson advances no evidence to support her assertion that her scores were lowered, Johnson's allegations cannot support an inference that Auburn's legitimate reason is

---

29. Theoretically, Johnson's score sheet, <u>see</u> Plaintiff's evidentiary submission on defendant's motion summary judgment (Doc. No. 26), Ex. 8, Self-assessment of Samantha Johnson, P0087, could itself create a genuine issue of material fact that her score was lowered.   A review of Johnson's score sheet, however, reveals the opposite.   The original reviewer entered several scores on the wrong lines, requiring the scores for "Complexity," "Work Reviewed," "Supv Received," and "Public Image" to be scratched out and reentered on the line above. Although it appears that her score for "Work Reviewed" was lowered from 145 to 130, her "Budgeting" score was raised from 0 to 138, as were the "Budgeting" scores of Allen, Funderburk, and Segrest, <u>see</u> Gerards declaration, Exs., 3, 5-6, pp. 0351, 0438, 0481.   The net effect was to raise Johnson's total score, which could only have raised her classification level, <u>see</u> Gerards declaration, Ex. 2, Study protocol, p. 0240.

pretextual.   See Grigsby v. Reynolds Metals, Co., 821
F.2d 590, 597 (11th Cir. 1987) ("Where the defendant's
justification   evidence   completely   overcomes   any
inference to be drawn from the evidence submitted by
the   plaintiff,   the   district   court   may   properly
acknowledge that fact and award summary judgment to the
employer").

Two broader observations further support Auburn's
proffered   non-discriminatory   reason   and   dispel   any
concern that reason might be pretextual.   First,
Johnson's job was eliminated a year after the 2002
study, and the jobs of her comparators were not.   The
2002 study was an objective study that apportioned
scores   based   on   various   duties   performed   by   the
employee   in   each   position.   Essentially,   the   weight
given to each duty reflects the value Auburn placed on
that job.   It is not hard to imagine that the final
score for Johnson's job, which became irrelevant due to
improved technology one year later, was lower than the
scores   for   her   comparators,   whose   jobs   were   not

eliminated.  Second, Johnson's suggestion that the 2002 study was used to discriminate against her because she was a black woman cannot withstand scrutiny because the 2002 study was more favorable, overall, to black employees than white employees.

Johnson obviously feels wronged by Auburn's decision not to promote or reclassify her for the last decade.  Even though Johnson was highly proficient at her job, proficiency was irrelevant under the 2002 study.  As the Eleventh Circuit Court of Appeals has explained, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984).  Johnson's alleged comparators performed substantially different duties, which warranted higher scores and a higher classification than Johnson's under the 2002 study protocol.  Johnson has not established discriminatory intent because she has produced neither

direct nor circumstantial evidence sufficient to support a finding that Auburn failed to reclassify her because of her race. Accordingly, the court will grant summary judgment on her race-discrimination claim.


## B. Retaliation Claim

To establish a prima-facie case of retaliation, Johnson must show (1) a statutorily protected expression; (2) an adverse-employment action; and (3) a causal link between the protected expression and the adverse action. Raney v. Vinson Guard Service Inc., 120 F.3d 1192, 1196 (11th Cir. 1997). In order for the employee to prove a causal link, the employer must, at a minimum, be aware of the protected expression when it takes the adverse action. Id. at 1197. If the employer is aware of the protected expression, the employee may prove the causal connection by showing a close time-link between the adverse-employment action and the protected activity. The shorter the period between the two events, the stronger the inference that

33

the adverse action was improperly motivated; conversely, a long period of time between the protected conduct and adverse-employment action will negate an inference that the adverse action was caused by the protected expression.

Auburn concedes, for the purposes of summary judgment, that Johnson engaged in protected expression and that the failure to reclassify was an adverse-employment action.  However, neither party identifies the specific instances of protected expression in which Johnson engaged.  Although Johnson repeatedly complained that race played a factor in Auburn's decision not to promote or reclassify her, the court need consider only Johnson's protected expressions that occurred before July 9, 2002, when she was informed that she had not been reclassified under the 2002 study.  See Griffin v. GTE Fla., Inc., 182 F.3d 1279, 1282 (11th Cir. 1999) (noting that "the adverse employment action must follow the statutorily protected conduct" to state a prima-facie case of retaliation).

34

These include the 1997 letter complaining that whites were bring promoted while she was not; the 1999 discussions with Auburn's Provost and President about racial disparities in promotions; and the 2000 complaint to Auburn's EEO officer.[30]

Johnson cannot prove a causal link between her 1997 letter or her complaints to senior administration officials in 1999 or the 2000 letter to the EEO officer and the failure to reclassify her position in 2002, because they are all too far removed temporally from the adverse action to support an inference of causal connection. See Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir. 1998) (holding that a three-year gap between protected conduct and an adverse-employment action negates any inference of causal connection); Sims v. Sauer-Sundstrand Co., 130

---

30. The EEOC complaint and both letters to Hallaway need not be considered because they occurred after the 2002 study had been completed and Johnson had been notified that her position was not reclassified. The 2002 study could not have been retaliatory for protected expression that had not yet occurred.

F.3d 341, 343 (8th Cir. 1997) (stating that employer's awareness of protected activity is insufficient to prove causal link if two-year gap existed between protected expression and adverse action).

Also, while Auburn had ample opportunity to retaliate against Johnson after these protected expressions, she continued to receive positive job evaluations and merit increases, and was among the highest paid employees in the Financial Aid Office prior to the 2002 study. Auburn's failure to retaliate in the interim between her complaints and the 2002 study, along with the award of significant merit-pay increases during that time, greatly undermines any inference that the 2002 study was retaliatory.

Even if Johnson could state a prima-facie case for retaliation, she has failed to show that the legitimate, non-discriminatory reason advanced by Auburn for its failure to reclassify her is pretext. For the reasons outlined at length in the discussion of

36

her discrimination claim, none of the bases Johnson advances to prove pretext withstands scrutiny.

Because Johnson has not proven a prima-facie case of retaliation or advanced any evidence that would allow a reasonable fact-finder to conclude that Auburn's proffered non-discriminatory reason for not reclassifying her was pretextual, Auburn is entitled to summary judgment on Johnson's retaliation claim.


## IV. CONCLUSION

For the foregoing reasons, the court concludes that Auburn is entitled to summary judgment on both Johnson's discrimination and retaliation claims.

An appropriate judgment will be entered.

DONE, this the 17th day of November, 2005.


<u>    /s/ Myron H. Thompson    </u>
UNITED STATES DISTRICT JUDGE